**AUSTIN BRIDGE COMPANY et al.,**
**Appellants,**

**v.**

**STATE of Texas et al., Appellees.**

**No. 11596.**

Court of Civil Appeals of Texas.

Austin.

April 24, 1968.

Rehearing Denied May 15, 1968.

Small, Herring, Craig, Werkenthin & Shannon, C. C. Small, Jr., Fred B. Werkenthin, Austin, for appellants.

Crawford C. Martin, Atty. Gen., Nola White, First Asst. Atty. Gen., A. J. Carubbi, Jr., Executive Asst. Atty. Gen., Watson C. Arnold, Dudley Fowler, Albert L. Der-den, Asst. Attys. Gen., Austin, for appellees.

HUGHES, Justice.

This suit was brought by Austin Bridge Company, Austin Contracting Company and B. G. Brown and Company, pursuant to legislative permission,[1] against the State of Texas and the Texas Highway Department to recover damages allegedly arising out of a contract entered into between Austin Bridge Company as prime contractor and the Texas Highway Department for the construction of a portion of State Highway No. 120 in Taylor County. The resolution authorizing this suit recites that the prime contractor and B. G. Brown of B. G. Brown and Company, a subcontractor, contend that the Texas Highway Department imposed additional burdens upon the contractors not contemplated by the contract and arbitrarily charged working days against the contractor, resulting in the imposition of liquidated damage penalties, when such charges were not justified.

The case was tried to a jury but upon the evidence being closed the trial court, upon appellees' motion, withdrew the case from the jury and rendered judgment that appellants take nothing by their suit.

Appellants' first three points, jointly briefed, are that the instructed verdict was erroneous for the reason that they were improperly charged working days during the period specified in the contract when the placing of asphalt was suspended resulting in the wrongful imposition of liquidated damages, and that the evidence either conclusively or factually so showed.

We copy the following general provisions of the contract in suit the consideration of which are relevant to a determination of these points:

"1.30 Working Day. A working day is defined as a calendar day, not including

1. Senate concurrent resolution No. 66, p. 1728, Acts, Reg.Sess. 58th Leg., 1963.

Saturdays, Sundays, or legal holidays in which weather or other conditions not under the control of the Contractor will permit the performance of the principal unit or work underway for a continuous period of not less than seven (7) hours between 7 a. m. and 6 p. m., except for every Saturday on which the Contractor chooses to work, one day will be charged against the contract working time when weather conditions will permit seven (7) hours of work as delineated above. Nothing in this special provision shall be construed as prohibiting the Contractor from working on Saturdays if he so desires.

\*　　\*　　\*　　\*　　\*　　\*

8.2. Prosecution of Work. Prior to beginning construction operations, the Contractor shall submit to the Engineer a chart or brief outlining the manner of prosecution of the work that he intends to follow in order to complete the contract within the allotted time.

\*　　\*　　\*　　\*　　\*　　\*

No asphaltic materials or mixtures except Emulsions and cut-back asphalts shall be placed between October 1 and April 1, unless specifically authorized or directed by the Engineer in writing.

\*　　\*　　\*　　\*　　\*　　\*

8.4. Temporary Suspension of Work. The Engineer will have authority to suspend the work, wholly or in part, for such period as he may consider necessary, and the 'Time Charge' will be suspended during such period. Notice of such suspension with the reasons therefor will be given the Contractor in writing. The Contractor shall not suspend work without written authority of the Engineer.

8.5. Computation of Contract Time for Completion. The Contractor shall complete the work within the number of working days stated in the contract. For the purpose of computation, working days will be considered fifteen (15) days after the date of the written authorization by the Engineer to begin work.

The Engineer will furnish the Contractor a monthly statement on forms furnished by the Department, showing number of working days charged during the month, total number of working days allowed in contract, and the working days remaining under the contract. The Contractor will be allowed ten (10) days in which to protest the correctness of the statement, otherwise the statement will stand. If the satisfactory completion of the contract shall require unforeseen work or work and materials in greater amounts of quantities than those set forth in the contract, then additional working days or suspension of time charge will be allowed the Contractor equal to the time which, in the opinion of the Engineer, the work as a whole is delayed.

8.6. Failure to Complete Work on Time. If the Contractor fails to complete the contract in the working days specified, the time charge will be made for each working day thereafter.

The time set forth in the Proposal for the completion of the work is an essential element of the contract. For each working day under the conditions described in the preceding paragraph that any work shall remain uncompleted after the expiration of the working days specified in the contract, together with any additional working days allowed, the amount per day given in the following schedule will be deducted from the money due or to become due the Contractor, not as a penalty, but as liquidated damages and added expense for engineering supervision:

\*　　\*　　\*　　\*　　\*　　\*

5.1. Authority of Engineer. The work will be done under the supervision

of the Engineer, to his satisfaction, and in accordance with the contract, plans and specifications. The Engineer will decide all questions which may arise as to the quality or acceptability of materials furnished and work performed; the manner of performance and rate of progress of the work; the interpretations of the plans and specifications; and the acceptable fulfillment of the contract on the part of the Contractor. His decisions will be final, and he will have executive authority to enforce and make effective such decisions and orders as the Contractor fails to carry out promptly.

5.2. Engineer as Referee. The Engineer will act as referee in all questions arising under the terms of the contract between the parties thereto, and his decisions shall be final and binding."

Appellants divided the contract work generally into three areas, (1) the dirt work, cuts, grading, etc. by Brown (2) the structure work, bridges, culverts, etc. by Austin Bridge and (3) the lime stabilization, subbase and asphalt pavement by Austin Contracting Company. As a rule the dirt work is done first, then the structural work and finally preparation of road base and placing asphalt, although some dirt work is normally required throughout the duration of the job.

The contract in suit was executed June 2, 1959, and on that date the State ordered work under it to commence June 18, 1959, and although some work commenced prior to that time, no time charges were made until June 18.

In February 1960, at a conference attended by representatives of all parties, appellants presented a work schedule which, if adhered to, would timely complete the project. At this time, appellants had used 120 of the 300 days allotted by the contract to complete the job. The evidence is conclusive that appellants did not follow the work schedule which they had set up and that by July of 1960 it became apparent that unless asphalt work could be done after October 1, 1960, and before April 1, the job could not be completed within the time allowed by the contract. In order to place asphalt between October 1 and April 1 it was necessary to obtain dispensation from the Project Engineer. This request was made by appellants and denied by the Engineer.

Since the asphalt work could not be completed before the October 1st ban appellants did not attempt to bring the job to the point that substantial portions of placing asphalt could have commenced and been completed prior to that date. In fact, only eight days remained for placing asphalt before October 1st if the work had progressed according to schedule.

Appellants on December 5, 1960 requested the State to suspend time charges on the project from October 1, 1960 to April 1, 1961, the period when under the contract asphalt could not be placed. This request was denied in part, the State suspending time charges for the period January 23, 1961 to April 1, 1961. The result of this action by the State was that 58 working days were charged against appellants between the period October 1, 1960 and April 1, 1961. If these working days are not charged against appellants the liquidated damages assessed against them would be reduced by $17,400.00, since the daily overtime penalty was $300.00.

It is appellants' contention that the failure of the Highway Engineer to grant the suspension of time charges as requested was contrary to express provisions of the contract, but if discretionary on his part was arbitrary action from which they should have relief.

Appellants after quoting Sec. 8.4 of Item 8 of the general provisions of the contract, supra, make this argument:

"The effect of the Special Provision to Item 8 of the contract quoted above, coupled with the Engineer's refusal to authorize asphalt operations between October 1 and April 1, is that part of the work (i. e. the placing of asphalt) is suspended for this period of time. The Engineer had the discretion to lift the contractual prohibition against the placing of asphalt which he refused to do. The result is exactly the same as if the Engineer had, on his own initiative, suspended the asphalt part of the work under the authority of Item 8.4 of the General Specifications and should be treated the same as a partial suspension under such provision. Item 8.4 leaves no discretion in the Engineer as to the suspension of time charges when the work is suspended, 'wholly or in part.' The language is plain and unequivocal * * * 'the "Time-Charge" will be suspended during such period.'

\* \* \* \* \* \*

The Engineer's suspension of time charges between January 23, 1961 and April 1, 1961 is a concession that the period during which asphalt laying is prohibited is to be taken into account, at least partially, in making time charges against the contractors."

We also quote from appellants' brief the following:

"Appellants submit (a) that they are entitled to a judicial interpretation of the contract in respect to the effect of the prohibition against laying asphalt from October 1 to April 1 or the work time to be assessed against them for the purpose of liquidated damages, (b) that there is no reasonable interpretation of Section 8.4 of the General Specifications other than that the suspension of a portion of the work, as substantial as the asphalt portion, requires a suspension of time charges during the period October 1, 1960 to April 1, 1961."

We are unable to agree with appellants that a proper construction of the contract deprives the State Engineer of any discretion in suspending time charges during the period October 1 to April 1 when asphalt could not be placed except by special authorization of the Engineer. The contract and the evidence before us is too plain to admit of this construction. The contract states in clear, unequivocal language that no asphaltic materials or mixtures shall be placed between the dates specified without written authority of the Engineer. The contract also provides that a "working day" is one, with exceptions, which "will permit the performance of the principal unit or work underway" for a certain period. This language was explained by Mr. John E. Robertson, President of appellant Austin Contracting Company, and we quote his testimony in this regard:

"Q   Mr. Robertson, how do you, in your thinking, determine what is the principal item of work or the controlling item of work on a contract?

A   It is the item that more or less controls the other items when going together, that would affect most of the progress of the work of the completion of the work.

Q   The ultimate completion?

A   Correct.

\*   \*   \*   \*   \*   \*

Q   You consider what the controlling item?

A   The lime in our opinion was the controlling item at that particular stage.

Q  It was the controlling item?

A  That's correct.

Q  How about when you got up to the stage of laying your 211 base? Did that then become the controlling item in your opinion?

A  Mr. Derden, there were times when the three items of grading lime, and the 211 base were going on simultaneously. If the dirt did not stay out in front of the lime, the dirt was the controlling item, if the lime could not stay out in front of the 211 then the lime was the controlling item, and until those two items got out in front where the other items could progress, then that item that was holding up our progress was what we considered the controlling item.

Q  I think that is a correct statement. Let's apply that same statement now to the laying of the 215 base, which is your top rock base, the last rock base that is put on. The 215 just precedes the laying of the asphalt in the scheduling of the work, isn't that correct?

A  Correct.

Q  Therefore, using that same statement which you have just made, would it not be correct to say then that the laying of the 215 base would be the controlling item of work on the job until such time as you have gotten far enough out in advance with the laying of 215 base, that it would be anticipated to stay ahead of the laying of asphalt?

A  That would be correct in determining a working day, but not in connection with the suspension of time.

Q  Well, I'm just asking you insofar as the controlling item of work on the job?

A  In determining working days, I will agree with you.

Q  That would make the 215 base the controlling item at that time?

A  If the asphalt was waiting on the 215 base, yes, sir, that is correct."

■  On October 1, 1960, appellants had not begun placement of the final Base 215 upon which the asphalt was to be placed. It follows that at such time the placing of the asphalt could not have reasonably been considered as the "principal unit or work underway," and hence suspended under the provisions of the contract. At such time it was determined by the Engineer that the controlling "unit or work underway" was the placing of Base 215 and prior Base 211. On January 23, 1961, when the State Project Engineer determined that enough of final Base 215 had been placed that asphalt placing when commenced would not be impeded, suspended all time charges. This was a matter within his exclusive discretion; and we find no evidence that in the exercise of this discretion that he abused it.

Appellants in seeking to create a factual issue in regard to the exercise of discretion by the Project Engineer rely upon the testimony of the State's Engineer Kitchell that if the work had progressed according to appellants' progress chart not more than 20% of the asphalt portion could have been completed by October 1, 1960. The result of this would have been, appellants say, that this completed portion of the asphalt and the other work if it had progressed as proposed would have been subject to weather deterioration during the period October 1 to April 1. Appellants

also point out that on April 1, 1961, the road bases were completed to the point that asphalt placing commenced and proceeded normally after April 1, 1961.

It is not for this Court to determine why the parties contracted as they did. The State has been in the business of building roads for a long time and we cannot assume that the printed contracts which it requires contractors to execute contain any provisions which are unfair or which long experience does not dictate. The time for appellants to have complained about the provisions of the contract which the State has invoked against them was before the contract was executed.

It is our opinion that the State through its Engineer has taken no action in reference to the matters presented by the points under discussion which were not reasonably in keeping with the terms of the contract and the undisputed evidence. We overrule the first three points.

Appellants' points four, five and six, jointly briefed, are that fact issues were raised by the evidence regarding dirt work and grading operations done by B. G. Brown and Company which such company was required to do in a wrongful manner needlessly extending the time for such work and operations by forty-six days, and that such company was not permitted to exercise its rights under the contract in these matters to its damage, alleged to be $60,000.00.

B. G. Brown & Company had the responsibility for the excavation of high places along the right of way to lower them to the proper grade level and the placing of the excavated material in low places to raise these areas to the proper grade level.

The test borings at the location of the cut involved did not indicate the presence of rock but during the actual excavation of the cut considerable rock was encountered, located two to seven feet below the surface. Mr. Brown testified that he construed the contract to permit him to incorporate the smaller rocks coming out of the cut (those six and eight inches in size) in the area of the fill or embankment not directly under the roadbed or pavement (i. e. out on the shoulders of the fill) and that the compaction and density requirements for an earth embankment would only be applicable to the area where the roadway or pavement would lie.

The Highway Department engineers disagreed with Brown and advised him that he had two choices. He could construct the particular embankment as a rock embankment which had to be principally rock with little dirt in it or entirely as an earthen embankment with the rock scattered through the entire fill provided he could compact the entire width of the embankment to the specification for a dirt embankment.

Mr. Brown testified that he proceeded with a dirt embankment in which the rocks were incorporated. He attempted, at the insistence of the highway engineers, to obtain the requisite compaction and density for the full width of the embankment even though he knew that the compaction and density requirements for an earthen embankment could not be met because of the presence of the rocks. He repeatedly rolled and watered and otherwise manipulated the material. Repeated tests of compaction and density were made without achieving the specified compaction and density. Finally the highway engineers allowed him to stop and accepted the fill even though the requisite compaction and density tests were never achieved. He spent at least forty-six extra days in working this cut and incurred double the expense and cost which should have resulted because of the requirements

made by the engineers. The resulting embankment never did achieve the requisite compaction and density by test.

The contract provisions, in addition to those previously copied, which we have considered in determining these points are:

Item 2.3 of the Contract titled "Examination of Plans, Specifications, Special Provisions and Site of Work" reads as follows:

"Before filing a bid, the bidder shall examine carefully the proposal, plans, specifications, special provisions, and the form of contract to be entered into for the work contemplated. He shall examine the site of work and satisfy himself as to the conditions which will be encountered relating to the character, quality, and quantity of work to be performed and materials to be furnished. The filing of a bid by bidder shall be presumptive evidence that he has complied with these requirements.

The borings, profile, and water elevations shown on the plans were obtained for use of the Department in the preparation of structural designs, and the Bidder is hereby cautioned that the Department assumes no responsibility for the accuracy of these data. The Bidder, in preparing his proposal, shall take cognizance of the difficulty of distinguishing between boulders and ledge rock, the difficulty of accurately classifying all materials encountered in making foundation investigations, the possible erosion of stream channels and banks after survey data have been obtained, and the unreliability of water elevations other than for the date recorded.

Claims for additional compensation due to variations between conditions actually encountered in construction and as indicated by the plans will not be allowed."

Paragraph (2) of Section 106.2 which defines "Earth Embankments" in the following terms:

"Earth embankments shall be defined as those composed principally of material other than rock and shall be constructed of accepted material from designated sources."

Paragraph (3) of Section 106.2 which defines "Rock Embankments" in the following terms:

"Rock embankments shall be defined as those composed principally of rock and shall be constructed of accepted material from designated sources."

"Special Provisions to Item 106" which provides in part:

"Except as otherwise specified, earth embankments shall be constructed in successive layers, for the full width of cross section of each of the four lane road and in such lengths as are suited to the sprinkling and compaction methods utilized, said compaction may be performed by any method, type, and size of equipment which will give the required compaction * * *""

This provision goes on to provide that density in earthen embankments will be required to at least 98%.

The third paragraph of Paragraph (2) of Section 106.2 under the heading "Earth Embankments" which provides as follows:

"Minor quantities of rock encountered in constructing earth embankment shall be incorporated in the specified embankment layers, or may be placed in accordance with the requirements for the construction of rock embankments in the deeper fills within the limits of haul shown on the plans, provided such place-

ment of rock is not immediately adjacent to structures. Also, rock may be placed in the portion of the embankments outside the limits of the completed roadbed width where the size of the lot prohibits their incorporation in the normal embankment layers."

The principal distinction between earthen embankments and rock embankments pertinent here is that earthen embankments are subject to density and compaction requirements not generally applicable to rock embankments.

The condition confronting Brown was that he had a quantity of rock which came out of this cut which was to be incorporated in the fill. He desired to avail himself of the latitude permitted by the last sentence of the contract language quoted above. (3rd par. of Par. (2) Sec. 106.2). He knew that he could not meet the compaction and density requirements of an earthen embankment if the rocks were distributed throughout the entire embankment because the machinery used to spread the fill (disc plows) would be lifted out of the dirt when a rock was encountered and the dirt around the rock would not get a proper mixing, that the rocks would shed water and create uneven moisture conditions in the fill. The weight of the compaction rollers would not be evenly applied because of the rocks.

With this knowledge that the size of the rocks prohibited their successful incorporation into the normal embankment layers, Brown requested authority to place the rocks "in the portion of the embankments outside the limits of the completed roadbed."

Regarding this request, Mr. Wade O. Crawford, District Construction Engineer for the State Highway Department, testified:

"Q Mr. Crawford, state whether or not you became aware of some troublesome conditions that Mr. B. G. Brown complained of with regard to some excess or minor rock that was showing up in the earthen embankment that he was constructing on this project in question?

A Yes, sir, I became aware of it.

\* \* \* \* \* \*

Q Mr. Crawford, will you just tell the Court and the jury of the problem as it was presented to you, the consideration as you gave it, as you saw it, and what recommendations you made to Mr. Brown, if any, concerning this problem?

A At that time, Mr. Brown informed me of his troubles and we had all seen this minor scattering of rock in the embankment as he was placing it. In discussing this, Mr. Brown asked the question, could he operate this embankment as he had done on a similar job in Roscoe, which had been done for two or three years in the past, and he requested at that time that it be done in that manner which was holding the toe of the slope in, and allowing the rock to be combed out and placed in the slopes of the embankment.

\* \* \* \* \* \*

Q Mr. Crawford, show us by drawing on the blackboard about this embankment?

A At the time we were discussing this operation, the embankment had been built approximately to this height. (Indicating) Approximately, it's hard to say, but maybe 2 feet and Mr. Brown was requesting that he be allowed to place and lift the dirt

in here, combing a few rocks over in an area in here (Indicating) which at that time, in my opinion, there probably wasn't ample rock to continue this operation up to this point. (Indicating) However, I did grant permission that he be allowed to do that, and which he did. As it went on, and it was carried on in this manner, 2 or 3 days later I had occasion to arrive on the job which at that time it was obvious by then he was in an area there (Indicating) and it was very obvious that the rock was not stationed to maintain this height which at that time he was told that it was necessary that he bring this up with compacted excavation which was being done by the way, when I arrived on the job. They had already taken that alternative and were doing that.

*    *    *    *    *    *

Q When you advised them that since they didn't have enough rock to keep the rock embankment on the slope up on a continuous level with the earthen embankment you state that you advised them that they would have to bring it on up with earthen fill, is that right?

A Yes, sir, compacted fill to maintain a level with the parts that he was compacting in the center of the embankment.

Q I'll ask you to state whether or not in your opinion as an engineer that was necessary from an engineer's viewpoint?

A Yes, sir, it was.

*    *    *    *    *    *

Q Well, I'll ask you to state in your opinion, whether or not, the require-

ment which you made constituted a denial of Mr. Brown's request to build the slope as rock fill?

A It could have been interpreted that way, yes, sir.

*    *    *    *    *    *

Q Mr. Crawford, the instructions as you have stated them, which you gave to Mr. Brown's son as superintendent on the job, I'll ask you to state whether or not that was based upon an engineer's opinion?

A Yes, sir, it was.

Q And that opinion was based upon what you considered to be necessary for the proper construction of this highway?

A Yes, sir.

Q I'll also ask you to state whether or not this decision was based upon your knowledge and interpretation of the specifications in the contract?

A Yes, sir.

*    *    *    *    *    *

Q Mr. Crawford, referring to this diagram that you were using a moment ago, and I want to be sure that I understand what you required in connection with this particular embankment. You said that he could do one of things, he could either comb out the rock that was in the fill, and place it as a rock embankment, that's number one, is that correct?

A Yes, sir, he could blade them out, and place them as a rock embankment.

Q Would he have to segregate the rock or could this be rock and dirt, or what?

A It would have to be principally rock, but naturally there would be a little dirt, when you combed them out, but it has to be principally rock to go in as rock embankment.

Q Then, you were saying that he did use the minor rock provision of the specifications that he would have to use the rock in conformity with the rock embankment specifications, and to you that meant that it had to be more than 50 percent rock, principally rock?

A That's right. The rock could be placed out there.

Q But it would have to be principally rock?

A Yes, sir.

* * * * * *

A Yes, sir, in allowing him to put the rock in the slope.

Q You were using or relying upon the phrase, 'may be placed in accordance with the requirements for the construction of rock embankments in the deeper fills within the limits of the clause shown on the plans?'

A Yes, sir, that's one portion.

Q Were you also using or relying upon this last sentence that says, 'Rock may be placed in the portions of the embankment outside of the completed roadbed width where the size of the rock prohibits their incorporation into the normal embankment layers?'

A Yes, sir.

Q And it was your interpretation, I take it, that in order to utilize this particular provision that the rock when placed in the outer limit of the embankment outside the roadbed that that rock had to be principally rock?

A Yes, sir.

Q And it couldn't be earth and rock where the earth predominated?

A That is right, no sir, it could not."

Regarding this matter, Mr. J. C. Roberts, State Highway Engineer testified:

"Q Did Mr. Crawford tell you what he had directed Mr. B. G. Brown or Mr. Brown's son, what he could do concerning this rock?

A Yes.

* * * * * *

Q Why did you concur with him from an engineering viewpoint, Mr. Roberts?

A Mr. Derden, in the construction of an embankment, the side slopes may be considered as the prop that hold that portion of the embankment or holds the road. And, in order to get good engineering construction it was my opinion, and it still is, that that entire roadbed must be brought up homogenously and at the same level in order that the embankment will be long lasting, and will not create under rain and weather, a longitudinal crack in or near the place of joining of the two materials.

* * * * * *

Q Now, Mr. Roberts, why would it not have been possible, and I'm asking you this as an expert and as an engineer, why could it not have been possible for Mr. Brown to let this rock ledge fall behind here, and go

on and finish this portion and then if he didn't have enough rock to face it out as rock embankment, come back later and put dirt on what rock he had been able to use, and finish that on up (Drawing on blackboard)?

A  As I said in the beginning, the slope is a prop.

Q  Yes, sir.

A  And, I still want to use the homogenous word, because it means, as I know it, all at one time, one unit. The prop then is not a stable portion of the embankment, and that we must have in order to have lateral pressure loads that are applied by traffic on the paved surface.

Q  Is it your opinion then, I'll ask you, was it your opinion then that if this portion, the main portion of the roadbed, had been constructed and compacted to the required density, and then this area on the slope had been built with earthen material, and later compacted to the required density, you find, and you state, that there would be a vein of weakness or a crack between the compacted areas?

A  I call it a plane of weakness and you call it a vein of weakness, that's right, its the same.

Q  If that should occur, this vein of weakness here, had occurred in the construction of that embankment, what in your opinion as an engineer would be the effect upon that in the future so far as that roadbed is concerned?

A  That isn't good construction.

Q  Why?

A  Because of the plane of weakness. The slope, which you so aptly draw and describe, is a prop for the embankment that lays under the roadway itself.

Q  What possibly could have happened if that had been allowed?

A  Variations in compaction, if they are not brought up at the same time, one material will dry out and will be tied to a wet material and a dry material, which doesn't make proper bond. Actually, in engineering terms it would be described as a, 'cold joint.'

Q  I'll ask you to state from the standpoint of an engineering viewpoint, if it could have happened that during the long extended wet spell, that that whole entire embankment could have sloghed off?

A  That was my fear, and that is my thought, and that is my judgment.

Q  So, it is your opinion that what Mr. Crawford requested of Mr. Brown or Mr. B. Brown Company was logical and reasonable and necessary to get proper construction of that embankment?

A  That is correct, sir.

Q  I'll ask you to state from your knowledge and understanding of the specifications, if that requirement of Mr. Crawford's and Mr. Kitchell's come within your knowledge and understanding of the specifications?

A  It does."

Appellants disclaim any intention to recover damages for "extra work" done by them due to change or alteration of plans

or specifications or for any additional work or expense expended by them as a result of encountering unforeseen subsurface conditions in the road area. They seek damages here based solely on the action of the State in not permitting them to handle "rock" by placing it "outside the limits of the completed roadbed width where the size of the lot prohibits their incorporation in the normal embankment layers."

■ The testimony of Engineer Crawford is specific on this point. There simply was not enough rock, in his judgment, to implement this alternative method of handling the rock. This is a matter within the exclusive and final authority of the engineer to determine under the express provisions of the contract, quoted above, in the absence of pleading and proof that the decision of the engineer was based on partiality, fraud, misconduct or gross error. We find no pleading or proof of any of these essential elements, hence appellants have shown no right to recover the damages sought. State v. Martin Bros., 138 Tex. 505, 160 S.W.2d 58. Points four, five and six are overruled.

Appellants' points seven, eight and nine are to the effect that an instructed verdict against them was improper because an issue of fact was presented as to whether a steel strike caused delay in performing the contract.

Steel, of course, was required for the construction of bridges, etc. It was promptly ordered by Austin Bridge but due to a steel strike it was not delivered until the middle of April 1960. Mr. Samuel A. Pinson, Vice President of Austin Bridge, testified that the delay in receiving steel delayed the overall completion of the job and that forty working days charged to the job was improper for this reason.

The evidence is undisputed that the substructure work necessary for the use of steel was not completed until a few days before steel was received. Mr. Pinson admitted that Austin Bridge could have completed the substructures earlier but that their normal procedure was to build them so as to have them ready about the time the steel arrived, and that nothing would have been gained by completing them earlier.

Mr. Pinson testified that if the steel strike had not intervened, his crews could have been doing their substructure work and steel work during the same period that B. G. Brown and Company was doing the dirt work and the work would have coincided in such a manner that time charges already incurred for dirt work would have covered this portion of the substructure steel work, and consequently, fewer working days would be charged to the project.

J. E. Robertson, President of Austin Contracting Company, testified that the last work to be done on the project was the placing of asphalt, which follows the lime stabilization and the laying of base material in that order, and that the steel strike among other unavoidable factors contributed to his part of the work starting at a later date.

Mr. Pinson also testified that the lime stabilization (part of Austin Contracting Company's operation) had to be carried right up to the bridges which obviously could not be done until the structures were completed, that they had planned to have the bridges completed so that the heavy equipment used in the base material operation could move across them, and that it was not economical, logical or prudent to commence the lime operation and the subsequent base operation until the uncertainties caused by the steel strike could be removed.

While the steel strike was in progress the record shows that other work was being done on the project for which time charges could be properly made.

■ The problem confronting appellants is that they have, by contract, given authority to the Highway Engineer to finally determine " * * * the manner of performance and rate of progress of the work. * * *" It may be arguable that appellants' plans for performing this contract were as good or better than those approved by the Engineer, but this is not sufficient. The evidence here, in our opinion, does not meet the test for upsetting the exercise of discretion by the Engineer in charging time to appellants or in not suspending these charges during the steel strike. The points under consideration are overruled.

Appellants' remaining points ten through twelve, are the instructed verdict was improper because a question of fact was raised as to whether some delay in the completion of the project was caused by unusual weather conditions and overflow of stock tanks, and as to whether the State was arbitrary in failing to give them credit for such delays in calculating liquidated damages.

Mr. Sam A. Pinson, Executive Vice President of Austin Bridge testified that during the period June through December 1959, the rainfall in the project area was 1.65 times the normal, which caused abnormal working procedures resulting in an estimated delay of twenty-five days in completing the project.

At the end of each month during the entire job period, the Highway Engineer made up a pay schedule on which the amount of work done and the amount of money earned by the contractors was stated as was the number of "working days" charged for the month and the number of such days remaining under the contract as required by its Item 8, Sec. 8.5. This section also provides that, "The Contractor will be allowed ten (10) days in which to protect the correctness of the statement, otherwise the statement will stand." Appellants did not comply with this contractual provision during the period covered by these points. In fact, they did not comply with this provision as to "working days" charged while the job was in progress except for five days charged in February 1960.

Mr. B. G. Brown of B. G. Brown and Company when queried as to why he did not do other work on the job during the period when it is claimed that it was too wet to work, testified:

"Q   So, it would have been an extremely expensive thing to move your equipment to another area of the project in order to avoid the particular wetness problem?

A   That's true.

Q   And, as a practical engineering judgment is concerned, it's not the way things are done on highway projects?

A   That's true."

■ We believe that the testimony of Mr. Brown clearly shows that in charging work days during the wet weather problem the Highway Engineer was exercising a final discretion vested in him under the contract and that no showing has been made under the relevant test for overruling such exercise of discretion. For this reason and because appellants did not timely object to the time charges, we overrule these points.

Finding no error, the judgment of the trial court is affirmed.

Affirmed.